UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SALLY SMITH,

                             Plaintiff,                        **REPORT AND**
                                                            **RECOMMENDATION**

              -against-                        18-CV-6836 (DRH) (ARL)

WALL STREET GOLD BUYERS CORP., et al.,

                              Defendants.
-------------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

        The plaintiff, Sally Smith ("Smith"), commenced this action against the defendants, Wall Street Gold Buyers Corp. ("Wall Street") and Rahamin Abromov ("Abromov"), alleging that the defendants violated the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 et seq. (the "FLSA"), New York Labor Law §§ 190 and 650 *et seq.* (the "NYLL"), 12 N.Y.C.R.R. § 146, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), and New York General Business Law ("NYGBL") § 349. Before the Court, on referral from District Judge Feuerstein,[1] are the parties' cross motions for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, the Court recommends that the motions be denied.

## BACKGROUND

### A.    Factual Averments

        Smith is a resident of Suffolk County New York. Compl. ¶ 7. Wall Street is a New York domestic corporation that owns stores throughout Nassau and Suffolk County where individuals can come to exchange gold or other valuables for cash. *Id*. ¶¶ 8, 14; Defs.' Rule 56.1 Stmt. ¶ 1. Wall Street's stores also operate as pawn shops where people can get loans using gold as collateral. ECF 29-1, 9:16-10:3. At all relevant times, Wall Street was subject to the FLSA.

---

[1] This case was reassigned to District Judge Hurley on July 6, 2021.

Defs.' Rule 56.1 Stmt. ¶ 2.  Abromov is the owner of and exercises operational control over Wall Street.  Compl. ¶¶ 10-3.

In 2012, Smith was hired by the defendants as a gold buyer for their store located at 1116 Middle Country Road, Selden, New York (the "Selden store").  Pl.'s Rule 56.1 Stmt. ¶ 1; Compl. ¶¶ 20-1.  Prior to working for the defendants, Smith was working for herself buying and pawning gold.[2]  Defs.' Rule 56.1 Stmt. ¶ 12.  In that capacity, Smith was trained to test jewelry to determine whether it is real.  *Id.* ¶ 11.  According to her deposition testimony, Smith was initially trained in the business by her former employer Guy Mitchell Serbers ("Serbers").  ECF 29-1, 9:14.  When Kevin Brody ("Brody") bought the business from Serbers, Smith continued to work for him.  *Id.* 7:24-8:2.  At some point, Smith claims that she operated her own business, although it is unclear if she was acting as an independent contractor, was still working for Brody at the time, or was simply using his license for her own gold buying business.  *Id.* 8:15-8; 11:6-15.

In any case, once Smith was hired by the defendants, she worked at their Selden store seven days per week from 10:00 a.m. until 7:00 p.m.  Pl.'s Rule 56.1 Stmt. ¶ 3; Compl. ¶ 22.  Smith worked at the store by herself and would keep track and memorialize her transactions in a detective log.  Defs.' Rule 56.1 Stmt. ¶ 17; Pl.'s Rule 56.1 Counter-Stmt. ¶ 17.  At the conclusion of each day, Smith would drive from the Selden store to the defendants' store in East Meadow, New York (the "East Meadow store"), where she would meet with Abromov to drop off the gold received at the Selden store during the day.  Pl.'s Rule 56.1 Stmt. ¶ 4; Compl. ¶ 23.  Smith claims that the trip from Selden to East Meadow added two hours to each of her workdays.  Pl.'s Rule 56.1 Stmt. ¶ 5; Compl. ¶ 24.  Smith stopped working at the Selden Store in March 2013.  Pl.'s Rule 56.1 Stmt. ¶ 6; Compl. ¶ 25.

---

[2] Prior to being hired by the defendants, Smith had been arrested twice in connection with the sale and pawning of gold.  ECF 29-1, p. 9-27.  Her second arrest involved interest she had charged on a loan.  *Id.*

In November 2014, Smith was rehired by the defendants to work at their store located at 54 Old County Road, Hicksville, New York (the "Hicksville store"). Pl.'s Rule 56.1 Stmt. ¶ 8; Compl. ¶¶ 27-8. Smith alleges that her schedule at the Hicksville store was the same as her schedule at the Selden Store, that being, seven days per week from 10:00 a.m. until 7:00 p.m. Pl.'s Rule 56.1 Stmt. ¶ 10; Compl. ¶ 29. At the conclusion of each day, Smith would drive from the Hicksville store to the East Meadow store to drop off the gold. Pl.'s Rule 56.1 Stmt. ¶ 11; Compl. ¶ 30. Smith claims that the trip from Hicksville to East Meadow added one hour to each of her workdays. Pl.'s Rule 56.1 Stmt. ¶ 12; Compl. ¶ 31. Smith stopped working at the Hicksville Store in April 2016 when it closed and was then reassigned to the East Meadow store. Pl.'s Rule 56.1 Stmt. ¶ 14; Compl. ¶ 25.

Smith worked at the East Meadow store until April 2018. Defs.' Rule 56.1 Stmt. ¶ 13. Smith worked from 10:00 a.m. to 7:00 p.m. *Id.* ¶ 14. Smith alleges that she rarely received a meal break. Pl.'s Rule 56.1 Stmt. ¶ 17. Smith continued to buy and sell gold for the defendants and was required to determine if the gold customers were selling was real. ECF 29-1, 79:12-14.[3] According to the record, from September 12, 2016 to August 6, 2017, Smith was paid a salary of $600.00 per week through Paychex. Defs.' Rule 56.1 Stmt. ¶ 20. However, Smith denies that she actually received $600 a week because her paychecks often bounced. Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 21-2. Abromov claims that he also paid Smith $100 in cash each week. Defs.' Rule 56.1 Stmt. ¶ 22. In any case, the defendants contend that Smith was never paid on an "hourly basis," a fact to which Smith admits. *Id.* ¶ 29.

In August 2017, Abromov canceled his Paychex account after closing all but one of his

---

[3] Smith denied this statement in her response to the defendants' Rule 56.1 Statements. *See* Pl.'s Rule 56.1 Counter-Stmt. ¶ 15. However, her deposition testimony confirms that she bought and sold gold for the defendants and tested the gold to see if it was real.

stores. *Id.* ¶ 24. He says that he no longer required the service since Smith was his only remaining employee. *Id.* From August 2017 to April 2018, the defendants claim Smith was paid in cash. *Id.* ¶ 25. Smith does not deny that she was paid in cash after August 2017 but does dispute that she was paid her full salary. Pl.'s Rule 56.1 Counter-Stmt. ¶ 25. By August 2017, Smith was only working five or six days a week and claims she was only paid $100-$165 per day. Defs.' Rule 56.1 Stmt. ¶ 27; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 25, 27. Smith also contends that there were times throughout the term of her employment when she would have to use her own money to operate the business and would frequently have her salary reduced if the defendants determined that she had purchased fake gold. Pl.'s Rule 56.1 Counter-Stmt. ¶ 29; Pl.'s Rule 56.1 Stmt. ¶¶ 19-22. She further claims that there were weeks when she received no pay because the defendants would claim that they didn't have enough money to pay her for the week. Pl.'s Rule 56.1 Stmt. ¶ 25; Compl. ¶ 46.

According to Smith's deposition testimony, she was fired three times during the course of her employment. ECF 29-1; 100:16-105:5. Smith testified that she was first fired while she was working at the Selden store because of the "ring incident" or "diamond incident." *Id.* She was also fired and rehired while she was working at the Hicksville store because "a detective came for gold and Abromov didn't have the gold for the detective." *Id.* Smith explained that the store had to keep gold for a certain number of days to prove that it was not stolen and Abromov blamed her when he couldn't find the gold. *Id.* Smith further alleges that she was fired after a robbery that took place and when the "labor board [was] coming" because Abromov closed the store. *Id.* Both times she was rehired. *Id.*

Although the parties have referenced Smith's employment history, Smith has not asserted any claims related to those firings. Indeed, Smith asserts that she quit her job in April 2018.

Defs.' Rule 56.1 Stmt. ¶ 30.  Smith also admits she never complained to Abromov that she was

not getting paid the correct amount of money.  *Id.* ¶ 31.

### B.    Procedural History

Smith commenced this action on April 30, 2018.  ECF No. 1.  On August 25, 2019, the

defendants filed their answer and the case was immediately referred to mediation.  ECF Nos. 7,

8.  In July 2019, the Court received a report that the mediation had been unsuccessful, so the

matter was referred to then Magistrate Judge Brown to set a discovery schedule.  In November

2019, the parties sought and were granted an extension of the initial discovery schedule to March

2020.  However, just before the case was reassigned to the undersigned, the parties sought and

were denied a second extension of that discovery schedule by Judge Feuerstein.  In fact, on

January 29, 2020, Judge Feuerstein issued an order warning the parties that there would be no

further extensions of the discovery deadline.

Nevertheless, in both March and April of 2020, Judge Feuerstein did provide the parties

with additional time to conduct discovery given that some delay had been caused by the

healthcare crisis.  Then, on June 16, 2020, Judge Feuerstein held a final pretrial conference with

the parties during which the defendants raised the issue of Smith's alleged exempt employee

status.  As a result, the Court directed the parties to submit simultaneous briefs on the issue by

August 17, 2020, which they did.  ECF No. 20.  Upon receipt, the parties' submissions were

referred to the undersigned.  After reviewing the submissions, the undersigned ordered the

parties to submit a joint statement setting forth the facts to which they agreed and the facts that

were in dispute in order to assist the Court in addressing the underlying issue.  However, by

letter dated September 22, 2020, the parties indicated that except for Smith's dates of

employment and the location of Wall Street's stores, the parties could not agree on any facts.

ECF No. 23.

Accordingly, on September 29, 2020, the undersigned held a conference with the parties during which the parties were directed to discuss the possibility of returning to mediation or, if mediation would be futile, to submit a summary judgment briefing schedule to the undersigned. In response to the Court's directive, the parties reported that they could not even agree if mediation would be productive. Accordingly, the Court deemed the memorandum that the parties had filed at Judge Feuerstein's request to be cross motions for partial summary judgment and granted the parties' request to submit reply briefs. The Court also directed the parties to submit Rule 56.1 statements/counterstatements in order to complete the required summary judgment filings. As indicated above, after the motion was fully briefed the case was reassigned to Judge Hurley.

## DISCUSSION

### A. Standards of Law

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Puglisi v. Town of Hempstead*, No. 10 CV 1928, 2012 WL 4172010, *6 (E.D.N.Y. Sept. 17, 2012) (quoting *In re Blackwood Assocs., L.L.P.,* 153 F.3d 61, 67 (2d Cir. 1998) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc*., 150 F.3d 132, 137 (2d Cir. 1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc*., 95 F.3d 123, 129 (2d Cir.

1996), *cert denied*, 520 U.S. 1228 (1997).

The trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]here must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish v. Ferguson*, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *Celotex,* 477 U.S. at 322).  A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

**B.    FLSA – NYLL**

**1.    Statute of Limitations**

As a threshold matter, the defendants have included one sentence in their memorandum noting that they have not addressed Smith's employment before September 12, 2016 because the cause of action for that time period is time barred.  Defs.' Mem. ¶ 16.  "Under the FLSA, the statute of limitations is two years, but when an employer's violations are found to be 'willful,' then the statute of limitations under the act is extended to three years." *Vasquez v. NS Luxury Limousine Service, Ltd.,* No. 18-CV-10219 (AJN), 2021 WL 1226567, at *13 (S.D.N.Y. Mar. 31, 2021) (citing 29 U.S.C. § 255).  The NYLL has a statute of limitations of six years, and thus, the

7

Court need not decide the issue of willfulness for the purposes of the FLSA statute of limitations at this point.[4]  *See id.*  In addition, the defendants have not provided sufficient legal support or an adequate explanation as to why they chose to disregard any claims accruing before September 12, 2016.  Accordingly, the undersigned recommends that to the extent the defendants appear to be claiming that any claims for unpaid wages or overtime accruing before September 12, 2016 are time barred that argument be rejected.

### 2.    Exempt Status

The crux of the defendants' argument is that Smith's FLSA and NYLL claims must be dismissed because she falls within the "EAP" or "white collar" exemption under both statutes. Defs.' Mem. ¶ 1.[5]  "The FLSA exempts certain employees based on their profession, job function, and other characteristics including employees who work in a 'bona fide executive, administrative, or professional capacity.'" *See Nunez v. Metro. Learning Inst., Inc.*, No. 18-CV-1757(EK)(VMS), 2021 WL 1176219, at *2–3 (E.D.N.Y. Mar. 29, 2021) (citing 29 U.S.C. § 213(a)(1)); *Sethi v. Narod*, 974 F. Supp. 2d 162, 183 (E.D.N.Y. 2013) ("The NYLL also provides exemptions for some employees similar to the FLSA.").  The requirements for these exemptions differ in several respects, but all require that an employee satisfy a salary test.  *See id.* (citing 29 C.F.R. § 541.100, 29 C.F.R. § 541.200).  From 2004 to 2019, the FLSA salary test required that exempt employees be compensated on a salary basis at a rate of not less than $455 per week. [6]

---

[4] "[A plaintiff] may recover unpaid compensation under the FLSA and the NYLL, but when the statutory periods of the FLSA and the NYLL overlap, [a] plaintiff cannot recover under both statutes." *Valerio v. K.A.M. Food Store, Inc.,* No. 19 CV 593 (MKB)(LB), 2019 WL 7764707, at *4 (E.D.N.Y. Dec. 26, 2019), report and recommendation adopted, No. 19 CV 593 MKB LB, 2020 WL 473614 (E.D.N.Y. Jan. 29, 2020) (citing *Arnoldo Lopez Vasquez v. Lahori Kebab & Grill Corp.*, No. 18-cv-2117 (JS)(SIL), 2019 WL 4396724, at *6 (E.D.N.Y. Aug. 13, 2019)).

[5] Neither party has included any argument concerning the claims filed under the FDCPA or the NYGBL.

[6] The threshold for the salary test has been modified numerous times since it was added to the regulations.  *See* e.g., 14 Fed. Reg. 7705 (Dec. 24, 1949); 14 Fed. Reg. 7730 (Dec. 28, 1949); 19 Fed. Reg. 4405 (July 17, 1954); 23 Fed. Reg. 8962 (Nov. 18, 1958); 26 Fed. Reg. 8635 (Sept. 16, 1961); 28 Fed. Reg. 9505 (Aug. 30, 1963); 32 Fed. Reg. 7823 (May 30, 1967); 35 Fed. Reg. 883 (Jan 22, 1970); 38 Fed. Reg. 11390 (May 7, 1973); 40 Fed. Reg. 7091 (Feb. 19, 1975).

The current regulations cover employees who are compensated on a salary basis at a rate of not less than $684 per week. *Id.* With respect to the administrative exemption, on which the defendants rely, a party must also show that the employees primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers. *Id.* (citing 29 C.F.R. § 541.200). Moreover, the employees' primary duties must include the exercise of discretion and independent judgment with respect to matters of significance. *Id.*

"'[B]ecause the FLSA is a remedial act, its exemptions . . . are to be narrowly construed,' and the burden rests on the employer to prove that a particular employee is exempt from the Act's requirements." *Anani v. CVS RX Servs., Inc.,* 788 F. Supp. 2d 55, 59 (E.D.N.Y. 2011), aff'd, 730 F.3d 146 (2d Cir. 2013) (quoting *Havey v. Homebound Mortgage, Inc.,* 547 F.3d 158, 163 (2d Cir. 2008)). Significantly, "these analyses, by their nature, are not often susceptible to resolution on motions for summary judgment." *Nunez*, 2021 WL 1176219, at *3. Nevertheless, the Court will carefully consider the defendants' argument that Smith was exempt from the FLSA and NYLL minimum wage and overtime requirements.

The defendants first argue that Smith's position met the requirements for an exemption because her "salary exceeded $455." Defs.' Mem. ¶ 14. Specifically, they argue that Smith worked at the East Meadow store seven days a week and earned "at least $150 per day" or "$750 a week." *Id.* In support of their argument, the defendants have provided the Court with a copy of Smith's 2016 W-2 from Wall Street, which reflects earnings of $29,500.00, as well hand-written notes dated from August 18, 2017 through April 10, 2018, which reflect that she received a daily salary of either $150 a day or $165 a day. ECF No. 21-2, 21-3. In addition, the defendants have annexed a Paychex printout to their reply memorandum that suggest that from September 2013

to April 2016, Smith was paid $500 per week and, from May 2016 to August 2017, Smith was paid $600 per week.  Finally, Abramov testified at his deposition that he also gave Smith cash every day.  ECF No. 21-4.

This evidence is, however, insufficient to support a finding as a matter of law that Smith was a salaried employee.  To begin with, Smith testified at her deposition that the checks she received from the defendants frequently bounced because of insufficient funds.  Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 21-2.  In other words, Smith claims that while the Paychex ledger might suggest that she was being paid more than the required minimum rate, the ledger does not reflect the reality of her situation.  See ECF No. 21, Ex. 2, Smith Dec., ¶¶ 9-10.  Second, Smith notes that the documents provided to the Court do not include salary information for March 2015 until October 2016 or several weeks in 2016 and 2017.  ECF No. 21-2, 21-3.  Finally, while her W-2 certainly suggests that Smith met the threshold dollar amount in 2016, Smith contends that she never received a predetermined salary but rather was paid $100-$165 on the days she worked. Defs.' Rule 56.1 Stmt. ¶ 27; Pl.'s Rule 56.1 Counter-Stmt. ¶¶ 25, 27.  The general criteria for determining whether an employee is paid on a "salary basis" is set forth in 29 C.F.R. § 541.602, which provides that an employee must receive a "predetermined amount constituting all or part" of the employees compensation, which is "not subject to reduction because of variations in the . . . quantity of work performed." *Anani,* 788 F. Supp. 2d at 62 (29 C.F.R. § 541.602(a)).  Here, the current evidence before the Court suggests that Smith was not paid a predetermined weekly or monthly amount.

With respect to Smith's duties, the defendants argue that Smith engaged in non-manual work directly related to the management or general business operations of Wall Street.  To this end, the defendants highlight the following: (1) Smith operated the stores to which she was

assigned by herself, meaning she was responsible for the daily operation of the business; (2) Smith bought and sold gold for her employer; (3) Smith would determine whether jewelry was real gold and give estimates to customers; (4) Smith would loan money to customers in exchange for holding the gold they had in a transaction known as "pawning;" and (5) Smith would document the detective log, which required her to photocopy a customer's license.  Nonetheless, the reason courts are reluctant to grant summary judgment based on an FLSA exemption is demonstrated in this case.  *See e.g. Sexton v. Am. Golf Corp.*, No. 13-CV-873, 2015 WL 5884825, at *3 (E.D.N.Y. Oct. 8, 2015).  While the defendants' characterization of Smith suggests that she basically ran the store, Smith argues that she was simply a gold buyer for the defendants.  Pl.'s Mem at 9.  To this end, Smith asserts that she was given a "bank" every day consisting of cash she could use to buy gold and other items from customers but that the defendants controlled the size of the bank, and thus, limited the number of items she could buy on any given day.  *Id.*  Smith also contends that she first had to obtain approval from Abromov before buying gold or other items for a certain price by texting him a picture of the item.  *Id.* Accordingly, while the record certainly contains some support for the claim that Smith had a managerial role, there are countervailing facts which suggest otherwise.  In short, issues concerning the way in which she was paid, how much she was paid, and her ability to exercise discretion and independent judgment with respect to matters of significance are questions for trial.  For these reasons, the Court respectfully recommends that the parties' motions be denied.

## OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  Such objections shall be filed with the Clerk of the

Court via ECF. Any requests for an extension of time for filing objections must be directed to Judge Hurley prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:   Central Islip, New York
         September 20, 2021

SO ORDERED:

_____/s_____
ARLENE R. LINDSAY
United States Magistrate Judge